**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**

ANHEUSER BUSCH EMPLOYEE'S
CREDIT UNION,

      Plaintiff,

vs.

TRAVELERS PROPERTY CASUALTY
COMPANY OF AMERICA

and

THE CHARTER OAK FIRE INSURANCE
COMPANY,

      Defendants.

Case No.  4:18-CV-01208-CDP

**ANHEUSER BUSCH EMPLOYEES' CREDIT UNION'S SUGGESTIONS**
**IN OPPOSITION TO TRAVELERS' MOTION FOR SUMMARY JUDGMENT**

COMES NOW Plaintiff, Anheuser Busch Employees' Credit Union ("ABECU"), by and through undersigned counsel, and submits the following Suggestions in Opposition to Travelers' Motion for Summary Judgment (Doc. 37).

**I. Introduction**

In this litigation, ABECU is seeking to enforce the coverage obligations of the defendant insurance companies as it pertains to claims arising out of a consumer class action. Travelers and its counterpart subsidiary The Charter Oak Fire Insurance Company (referred to jointly herein as "Travelers") issued a series of commercial general liability and umbrella policies (hereinafter referred to as the "CGL Policies"), to ABECU in 2014, 2015 and 2016.  The claims at issue, which will be discussed in detail below, were set forth in a class action counterclaim filed against

1

ABECU in 2016 in a case entitled *Anheuser-Busch Employees' Credit Union vs. Wells* (hereinafter referred to as the "Wells Counterclaim" or "Counterclaim").

It is widely understood that CGL policies are "designed to protect the insured from losses arising out of business operations." *Overview of commercial general liability policies*, 9A Couch on Ins. § 129:1.  Coverage is sought by ABECU for third-party damages paid by ABECU to the *Wells* class members arising out of standard business operations in administering car loans. In particular, the claims involved the content of notices sent to borrowers who had defaulted on their car loans and the content of credit reports that were reported to credit bureaus.

Travelers argues that it has no duty to defend ABECU for the claims made against ABECU in the Wells Counterclaim and, inasmuch as the duty to defend is broader than the duty to indemnify, it would have no obligation to indemnify.  Travelers presents two bases for their position. Their first argument is that ABECU's conduct as alleged in the Counterclaim was intentional.  Their second argument is that ABECU's conduct amounted to professional services which fell within an exclusion entitled "Professional Credit Union Financial Services".  In essence, Travelers seeks to carve out the *commercial liability* coverage from its *commercial general liability* policies offered to and paid for by ABECU.

As to their first defense, the allegations in the Wells Counterclaim, as well as the information available to Travelers at the time of its coverage review, clearly reveal that the claims asserted against ABECU involved accidental and unintentional conduct.  As to their second defense, the exclusion in question is fatally ambiguous and the alleged misconduct did not involve professional services under any objective definition of that term.  Travelers' request for judgment as a matter of law falls well short of the required standard needed to avoid its duty to defend and indemnify ABECU for the loss in issue. Accordingly, ABECU requests that the

Court deny Travelers' Motion for Summary Judgment. ABECU also requests that the Court grant judgment in favor of ABECU on Travelers' claims concerning its duty to defend ABECU under Coverage A of the CGL policies and further requests that the Court grant judgment in its favor on Coverage B by finding as a matter of law that the policies afford indemnity coverage.

## II.    Applicable Standards.

### A.    Summary Judgment.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Whitehead v. Lee Enterprises*, No. 4:12CV01302 ERW, 2013 WL 3542686, at *2 (E.D. Mo. July 11, 2013); Fed.R.Civ.P. 56(a).   Federal Rule of Civil Procedure 56(c) provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact. *Id.*; Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  "Summary judgment will not lie if a genuine dispute about a material fact is shown; 'that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.*  "In ruling on a motion for summary judgment, the Court may not make credibility determinations, weigh the evidence, or draw inferences from the facts." *Torgerson v. City of Rochester,* 643 F.3d 1031, 1042 (8th Cir.2011).

"To satisfy his initial responsibility, the movant must inform the court of the basis for his motion and must identify those portions of the record that he believes demonstrate the absence of a genuine issue of material fact." *Whitehead*, 2013 WL 3542686, at *2. "Once the moving party has discharged the requisite evidentiary burden, the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Id.* "If the nonmovant fails to produce such evidence, summary judgment in favor of the moving party is proper." *Id.*

### B.   Construction of Insurance Policies; Duty to Defend.

Travelers' Motion for Summary Judgment is based on the argument that it had no duty to defend ABECU against the *Wells* class counterclaim.  Simply stated, under Missouri law, "[i]f the complaint against the insured 'alleges facts that give rise to a claim potentially within the policy's coverage, the insurer has a duty to defend.'" *Esicorp, Inc. v. Liberty Mut. Ins. Co.*, 193 F.3d 966, 969 (8th Cir. 1999) (citing *McCormack Baron Mgt. v. American Guarantee,* 989 S.W.2d 168, 170-171 (Mo. banc 1999)).

> The duty to defend is normally determined by comparing the policy language with the allegations in the complaint.  But the insurer may not ignore "actual facts," that is, "facts which were known, or should have been reasonably apparent at the commencement of the suit."

*Esicorp*, 193 F.3d at 969 (citing *Marshall's U.S. Auto Supply v. Maryland Cas. Co.,* 354 Mo. 455, 189 S.W.2d 529, 531 (Mo. 1945)).  Accordingly, Travelers may not limit its coverage review to the four corners of the *Wells* class counterclaim.  *See Id.*

"If the complaint merely alleges facts that give rise to a claim potentially within the policy's coverage, the insurer has a duty to defend." *McCormack,* 989 S.W.2d at 170-171.  "The presence of *some* insured claims in the underlying suit gives rise to a duty to defend, even though

uninsured claims or claims beyond the coverage may also be present." *Wood v. Safeco Ins. Co. of America,* 980 S.W.2d 43, 47 (Mo. Ct. App. 1998) (emphasis added).

"Where the insurer argues that it had no duty to defend based on a policy exclusion placing a third party's claim outside the policy's coverage, the insurer has the burden of demonstrating that the exclusion applies." *Fleishour v. Stewart Title Guar. Co.*, 743 F. Supp. 2d 1060, 1066 (E.D. Mo. 2010).

Moreover, an insurance policy must be construed liberally in favor of the insured. *White v. Smith*, 440 S.W.2d 497, 511 (Mo. Ct. App. 1969). "An insurance policy must be construed liberally in favor of the insured so as not to defeat, without plain necessity, his claim to indemnity which in procuring the insurance it was his object to secure It is settled law that, where the language of a policy is reasonably susceptible of different constructions, the courts must adopt the construction least favorable to the insurer and most favorable to the insured. *Id. at* 511.

**III.     Arguments and Authorities.**

The Wells Counterclaim alleged multiple wrongful acts triggering coverage for "property damage" under Coverage A of all three CGL and accompanying Umbrella policies in place during the subject time period as well as for "personal injury" under Coverage B of the same policies. Travelers' Motion for Summary Judgment seeks to avoid coverage under both Coverages A and B.

Subsection A (below) addresses Travelers' arguments relative to Coverage A, which are limited to whether the allegations of the Wells Counterclaim state an "occurrence" as defined by the CGL Policies and whether Coverage A's Intentional Act Exclusion is applicable.

Subsection B (below) addresses Travelers' arguments relative to Coverage B, which are limited to whether the Professional Credit Union Financial Services Exclusion operates to defeat coverage for the "personal injury" claims that would otherwise be insured.  The Intentional Act Exclusion is not applicable to Coverage B.

## A.     Coverage A—Property Damage

Travelers' brief addresses the requirement of an "occurrence" and the applicability of the Intentional Act Exclusion separately in its brief.  The two concepts, however, are interrelated in that an intentional act does not qualify as an occurrence. Because the same facts operate to defeat both arguments, ABECU will address them together.

The CGL Policies provide coverage for "property damage" caused by an "occurrence." (SUMF ¶¶ 23-24) The definition of "property damage" includes the "loss of use of tangible property that is not physically injured."  (SUMF ¶¶ 28-29) The CGL Policies define "occurrence" as "an accident including continuous or repeated exposure to substantially the same general harmful conditions."  (SUMF ¶ 25)

The term "accident" has been defined by Missouri courts as "an event that takes place without one's foresight or expectation; a sudden and unexpected event."  *Murphy v. Western and Southern Life Ins. Co.*, 262 S.W.2d 340, 342 (Mo. Ct. App. 1953).  An "accident," need not be a sudden event; it may be the result of a process.  *Columbia Mut. Ins. Co. v. Epstein*, 239 S.W.3d 667, 672 (Mo. Ct. App. 2007).  An accident refers to an unexpected happening rather than one occurring through intention or design.  *St. Paul Fire & Marine Ins. Co. v. McBrayer*, 801 F.2d 1012, 1014 (8th Cir. 1986) (citing *Farmers Ins. Co. of Arizona v. Vagnozzi*, 138 Ariz. 443, 449 (Ariz. 1983)).  Additionally, the fact that an occurrence is the result of a continuing condition does not preclude it from being an accident where the insured was unaware of the condition.

6

*Benedictine Sisters of St. Mary's Hosp. of Pierre, S.D. v. St. Paul Fire & Marine Ins. Co.*, 815 F.2d 1209, 1211 (8th Cir. 1987) (applying South Dakota law).

The determinative inquiry into whether there was an accident is whether the insured foresaw or expected the injury or damages. *D.R. Sherry Constr., Ltd., Am. v. Family Mut. Ins. Co.*, 316 S.W.3d 899, 905 (Mo. 2010) (citing *Epstein*, 239 S.W.3d at 672–73). For example, a Missouri court found an "occurrence" or an "accident" when a concrete provider was unaware that a batch of concrete was defective, resulting in sub-floor damage, because it was unforeseeable that the concrete was defective. *Epstein*, 239 S.W.3d at 672–73. Conversely, no "occurrence" will lie if an insured undertakes a course of action, knows of the substantial risks involved, proceeds in light of such knowledge, and disregards the known hazard. *Diocese of Winona v. Interstate Fire & Cas. Co.*, 89 F.3d 1386, 1392 (8th Cir. 1996).

Accidental also means unintentional. *St. Paul Fire & Marine Ins. Co.*, 801 F.2d at 1014. Further, the rationale courts have used regarding the "expected or intended" injury exclusion is virtually indistinguishable from the rationale used to determine whether the conduct meets the definition of an "accident" under the policy. *Pins v. State Farm Fire & Cas. Co.*, 361 F. Supp. 2d 1053, 1058 (8th Cir. 2007). Accordingly, the same analysis is applied to determine whether the allegations involved an "occurrence" and intentional conduct.

Travelers would have the Court believe that the Wells Counterclaim simply amounts to wrongful repossession claims, and then goes on to cite caselaw indicating that the act of repossessing a car is considered to be a non-accidental, intentional act which is not covered under most commercial general liability policies. However, this approach would force the Court to ignore the majority of the claims in the counterclaim.

The actual claims in the Wells Counterclaim relate to ABECU's failure to provide UCC-compliant notices to the class members, both pre- and post-repossession, and to the reporting of disparaging information to credit bureaus.  For instance, the Wells Counterclaim lists the allegations applicable to the proposed nationwide class under "Count I – Class's Claims."  The allegations do not relate to the act of repossession, but focus on the notices, and in some instances the lack thereof, which were sent to the borrowers prior to or subsequent in time to the repossession of the subject vehicles.  The allegations are as follows:

> 68.    AB Credit Union violated the UCC by failing to provide the presale notice in the form and manner required under the UCC before disposing of collateral secured by loans entered by, assigned to, or owned by AB Credit Union.
>
> 69.    AB Credit Union did not use the form of notification provided in § 9-614(3) of the UCC when sending presale notices to Wells and the Class.
>
> 70.    AB Credit Union's presale notice to Wells and the Class included additional language or content not authorized or allowed by law, rendering the presale notices misleading or unreasonable in violation of §§ 9-611 and 9-614 of the UCC.
>
> 71.    As required under § 9-611 of the UCC, AB Credit Union failed to provide "reasonable authenticated notice of disposition" to Wells and the Class.
>
> 72.    AB Credit Union did no send post-sale notices, or any other explanation or writing, to Wells and the Class provided all the information, in the requisite order, as required by § 9-616 of the UCC.

(SUMF Exhibit B Pl.'s First Am. Answer & Countercl., p. 14, ¶¶ 68-72)

The Wells Counterclaim also alleged that, due to the problematic notices, defamatory information was reported to all of the major credit bureaus. For example, these allegations include:

> 36. AB Credit Union has maintained a practice and policy of reporting derogatory information regarding the class members to local consumer reporting agencies and the three national consumer credit reporting agencies: Equifax Credit Information Services, Inc., Experian, Inc., and TransUnion, LLC (collectively,

"CRAs"), despite its failure to comply with the right to cure, presale and post-sale notice requirements.

37. The defective right to cure, presale and post-sale notices, and the reporting of false or inaccurate derogatory information on the class members' credit reports harmed the class members' credit worthiness, credit standing, credit capacity, character, and general reputation.

38. The defective right to cure, presale and post-sale notices, and the reporting of false or inaccurate derogatory information on the class members' credit reports were oral or written publication of material that defames, slanders or libels the class members.

(SUMF Exhibit B, Pl.'s First Am. Answer & Countercl., p. 14, ¶¶ 36-38)

Based on these notice allegations, the class counterclaimants alleged both in their First Amended Answer and Counterclaim and in subsequent discussions between the parties that the class claimants suffered the loss of use of their vehicles as a result of their inability to redeem their vehicles due to ABECU's faulty or missing notices.  (SUMF Exhibit B., p. 14, ¶¶ 68-72 and Plaintiff's Additional Material Facts ¶ 56, and Exhibit K, Ron Kampwerth Aff ¶ 3).   What is clear is that nothing within these allegations, nor in discussions with counsel for the Wells class members, suggested that ABECU intended to cause damage to the class members in connection with the described notice issues.  (See absence in record; SUMF Exhibit B, Pl.'s First Am. Answer & Countercl.)  In other words, these allegations fairly describe negligence in the drafting or failure to send notices to appropriately apprise ABECU's borrowers of the status of the disposition of their repossessed vehicles and the calculation of their resulting deficiencies.  No part of these allegations characterizes the notice problems as non-accidental or intentional. Additionally, it borders on absurdity to suggest that ABECU deliberately sent notices that they were aware or foresaw could subject them to liability under the UCC or that they would intentionally submit inaccurate or defamatory information to credit bureaus.

Moreover, the mere fact that these notices are contemplated in connection with a physical repossession of a vehicle does not limit the analysis as Travelers proposes. To the contrary, Missouri law considers the physical repossession of a vehicle and the sending of related notices as separate and legally distinct acts. *Wolfe Auto. Grp., LLC v. Universal Underwriters Ins. Co.*, 808 F.3d 729, 733 (8th Cir. 2015). Notably, in Mr. Wells' case, there was no dispute that he was in default on his loan and that ABECU was entitled to repossess his vehicle as a remedy. The act of repossession was not the basis of the counterclaim. Rather, the majority of the claims arose out of the pre-and post sale notices that were issued *after* the vehicle was repossessed.

In *Wolfe*, a Missouri used-car dealership was insured under two policies by Universal. In contrast to the CGL Policies provided by Travelers, the Universal policies provided coverage for damages arising from the "wrongful repossession" of an automobile. *Id.* at 730-31. Despite interpreting policy provisions which are distinguishable from those operative here, the *Wolfe* court's analysis of the physical act of repossession, as opposed to pre- and post-sale notices, is instructive.

The nature of the class claims in the *Wolfe* case are similar to the case at bar. Following Wolfe's repossession of a vehicle due to missed payments, Wolfe sued for a deficiency balance and the debtors counterclaimed on behalf of themselves and similarly situated consumers alleging that Wolfe's pre-/post-sale notices violated Missouri's UCC. *Id.* at 731. Wolfe tendered the counterclaims to Universal for defense and indemnity coverage. Universal refused on the ground that the allegedly deficient notices were not "wrongful repossessions" as that term was defined and covered under the policy. Wolfe contended the phrase included not only the physical appropriation of a vehicle but also the notice procedures required for its disposition.

Universal countered that wrongful repossession meant Wolfe must not have had the right to take the vehicle at the time of repossession.

The issue in *Wolfe* was whether the meaning of "repossession" included the procedures required by statute for disposition of the collateral. *Id.* at 733. The court held that "repossession" did not include procedures required by statute for disposition of collateral, indicating that the pre- and post-sale notices were not part of the repossession. *Id.* at 734. Rather, the notices were sent after the repossession was complete and in connection with the sale, a separate event.

> Although an ordinary insured, it should be presumed, is not intimately familiar with the U.C.C., it is telling that the U.C.C. treats repossession and disposition as distinct events. *Compare* Mo.Rev.Stat. § 400.9–609 ("After default, a secured party ... [m]ay take possession of the collateral ... [w]ithout judicial process, if it proceeds without breach of the peace."), *with id.* § 400.9–610 ("After default, a secured party may sell ... the collateral...."). Moreover, a creditor *may* dispose of the collateral, but it is not required to do so. *See id.* Thus, under the U.C.C. repossession does not necessarily entail the notice procedures that Wolfe claims form part of the same integrated process.

*Wolfe Auto. Grp., LLC*, 808 F.3d at 734, n. 4.

The court stated: "Here, by contrast, the pre- and post-sale notices were not part of the repossession; they occurred after the repossession was complete and in connection with the sale, a separate event." *Id.* at 734.

Clearly, counterclaims related to pre-and post-sale notices are not swept into the general rubric of wrongful repossession as attempted by Travelers. Thus, as explained below, Travelers' reliance on the *Allen* and *Landers* cases is misplaced.

### 1. *Landers Auto Group v. Continental Western Insurance Co.* does nothing to relieve Travelers of its duty to defend.

In *Landers*, an automobile dealer brought an action against its liability insurer, seeking a declaration that the insurer had a duty under the parties' insurance contract to defend it in an

11

underlying wrongful repossession action.  *Landers Auto Group v. Continental Western Insurance Co.*, 621 F.3d 810 (8th Cir. 2010).  The wrongful repossession claim arose when Landers repossessed a vehicle based upon the mistaken belief that the borrower had failed to make several payments and was in default on her loan.  The buyer subsequently filed a wrongful repossession claim against Landers.  Landers requested coverage from its insurer Continental Western.  Landers argued that the underlying lawsuit was a covered event under her commercial general liability policy.

The court found that the claims against Landers did not arise from the accounting errors by the financing company, but from the intentional act taken by Landers with respect to its rights and obligations under the financing agreement.  In other words, the claim arose from Landers's physical repossession of the vehicle when it had no right to do so.  Thus, *Landers* is distinguishable from the case at bar as there is no claim that ABECU had no right to send pre- and post-sale notices; rather, that they sent the notices in the wrong form or that they failed to provide information required within the notices—*a failure to comply with the UCC*.  This failure can hardly be characterized as an intentional act, especially given the absence of allegations of intent in the *Wells* Counterclaim.  Accordingly, *Landers* is inapplicable here.

### 2.   *Allen v. Continental Western Insurance Co. does nothing to relieve Travelers of its duty to defend.*

The result is the same in *Allen v. Continental Western Insurance Co.*, 436 S.W.3d 548 (Mo. banc. 2014), where a secured lender ("Franklin") brought an action against its CGL insurer for refusing to defend a borrower's suit alleging wrongful repossession.

In *Allen*, the court explained that the purpose of a CGL is for business owners to protect against the unpredictable, potentially unlimited liability that can be caused by accidentally causing injury to other persons or their property.  *Id.* at 554.  It does not protect its insured's

deliberate actions because liability insurance policies typically exclude coverage for injury or damage intended or expected by the insured.  The *Allen* court ultimately held that because Franklin intended to repossess the vehicle, there was no potential for coverage under the policy. *Id.* at 556.

Allen and the instant case are distinguishable. Although the CGL in *Allen* and the Travelers' policies use similar language, the ruling in *Allen* was driven by the fact that the underlying claim was for wrongful repossession, which the court found to be intentional actions of the insured.  Here, the underlying case is focused on improper pre- and post-sale notices which were not cast as deliberate or intentional.  Instead, ABECU was alleged to have incorrectly formulated its notices, incorrectly calculated deficiencies owed, and failing to take actions necessary to apprise the class claimants of information necessary to redeem their vehicles.  *Allen's* holding is not applicable here.

### 3.    Conclusion

The Wells Counterclaim does not support a finding that ABECU's conduct was deliberate, intentional and non-accidental.  The Wells Counterclaim alleged a pattern of noncompliance that resulted in unforeseen and unanticipated damages.  The sending of defective pre- and post-sale notices were unintentional "occurrences" as defined in the CGL Policies.  The release of allegedly harmful or defamatory credit histories to credit bureaus was also unintentional. There is a distinct and significant difference between the act of sending the notices and reporting to credit bureaus and knowledge that the notices were non-UCC compliant and that the information in credit reports was incorrect.

Travelers clearly had a duty to defend under Coverage A of the CGL Policies for the loss of use claims in the Wells counterclaim.

**B.     Coverage B – Personal Injury and the Professional Credit Union Financial Services Exclusion**

Travelers also seeks to avoid its coverage obligations under Coverage B on the basis of an exclusion identified as the Professional Credit Union Financial Services Exclusion.

As discussed in more detail below, Travelers acknowledges that, absent an applicable exclusion, Coverage B of the CGL Policies provides coverage for the claims in the underlying lawsuit.  Travelers bears the burden of proof on the avoidance of coverage based upon policy exclusions, and such exclusions are to be strictly construed in favor of coverage.  *See Christian v. Progressive Cas. Ins., Co.,* 57 S.W.3d 400, 403 (Mo. Ct. App. 2001).  Further, whereas the term "credit union financial services" is defined in the policies, the actual title of the exclusion is "*Professional* Credit Union Financial Services".  This phrase is not defined in the policies nor is the term "professional," although many other terms are defined.  (SOMF Exhibits C,D and E; CGL Policies, Section V "Definitions" at 12).  As used in the context of this exclusion, the term "professional" is either unenforceable, ambiguous or inapplicable.

Although Travelers couches their argument as a lack of a duty to defend under this exclusion, it is ABECU's position that, for the reasons discussed, this exclusion does not operate to nullify a defense or indemnity coverage.  Accordingly, ABECU is requesting that the Court enter summary judgment in its favor with a declaration that Coverage B of the policies provide indemnity coverage as a matter of law.

*1.     Overview*

Coverage B of the Travelers CGL Policies provides insurance coverage for "personal and advertising injury."  (SUMF ¶ 30.)  ABECU contends, and Travelers concedes[1], that the claims

---

[1] "It is true that the Amended Counterclaim seeks damages for AB Credit Union's alleged reporting of false or derogatory information on the class members' credit reports." (Page 11 of Memorandum of Law in Support of Travelers' Motion for Summary Judgment)

14

set forth in the Counterclaim fall within Travelers' definition of "personal injury."  In relevant

part, the CGL Policies define "personal injury" to include "oral or written publication, in any

manner, of material that slanders or libels a person...."[2]  (SUMF ¶ 35-36.)   The term is defined

almost identically in the Umbrella Policies. Travelers makes no argument that umbrella coverage

would not apply if it weren't for the professional credit union financial services exclusion.

The Wells Counterclaim alleged that ABECU published false and defamatory statements

in its attempt to collect a debt.  (SUMF ¶¶ 8-9.)  In particular, it was alleged that, due to the

defective notices, ABECU reported inaccurate information regarding the class members to local

consumer reporting agencies and the three national consumer credit reporting agencies. (SUMF

Exhibit B, Wells First Am. Answer & Countercl., p. 10, ¶ 36.)

---

[2] The definition in its entirety states as follows:
"**Personal injury**":
a. Means injury, other than "**advertising injury**", caused by one or more of the
following offenses:
(1) False arrest, detention or imprisonment;
(2) Malicious prosecution;
(3) The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room,
dwelling or premises that a person occupies, provided that the wrongful eviction, wrongful entry or invasion of the
right of private occupancy is committed by or on behalf of the owner, landlord or lessor of that room, dwelling or
premises;
 (4) Oral or written publication, including publication by electronic means, of material that slanders or libels a
person or organization or disparages a person's or organization's goods, products or services, provided that the claim
is made or the "**suit**" is brought by a person or organization that claims to have been slandered or libeled, or that
claims to have had its goods, products or services disparaged; or (5) Oral or written publication, including
publication by electronic means, of material that:
(a) Appropriates a person's name, voice, photograph or likeness;
(b) Unreasonably places a person in a false light; or
(c) Discloses information about a person's private life.
b. Includes "**bodily injury**" caused by one or more of the offenses described in
Paragraph a. above

The Counterclaim also alleged that, by sending the defective right to cure, pre- and post-sale notices, and consequentially reporting false or inaccurate derogatory information on the class members' credit reports, the class members suffered harm to their credit worthiness, credit standing, credit capacity, character, and general reputation.  (SUMF Exhibit B, Wells First Am. Answer & Countercl., p. 10, ¶ 37.)  It was alleged that these same activities constituted oral or written publications that defame, slander or libel the class members.  (SUMF Exhibit B, Wells First Am. Answer & Countercl., p. 10, ¶ 37.)  Significantly, ABECU has acknowledged that the notices in question were, in fact, defective and not in compliance with applicable law.

Inasmuch as the CGL Policies clearly provide coverage for the claims in question, the only way Travelers can avoid its coverage obligations is through an applicable and enforceable exclusion.[3]

Travelers has taken the position, and asks this Court to find as a matter of law, that an exclusion which was added by endorsement to the CGL Policies operates to nullify the duty to defend, and thus indemnity coverage, for the personal injury claims contained in the Counterclaim and tendered by ABECU to Travelers.  The exclusion upon which Travelers relies is entitled "Professional Credit Union Financial Services Exclusion", which states as follows:

This insurance does not apply to:

**Professional Credit Union Financial Services**

"Personal injury" or "advertising injury" arising out of providing or failing to provide professional "credit union financial services" by any insured to others.

(SUMF ¶ 38.)

---

[3] Travelers has also claimed that coverage is defeated by ABECU's alleged failure to provide timely notice of the lawsuit.  Travelers has expressly reserved the right to pursue that defense at a later date.

Quotations marks are used to identify terms or phrases which are defined in the policy. Although the policies define no fewer than 30 words or phrases, nowhere does Travelers define what is meant by the term "*professional* credit union financial services", nor is the term "professional" defined.  Instead, the policies only provide a definition of "credit union financial services," as follows:

"Credit union financial services" includes:

a.  Any of the services that any insured provides or is required to provide for any insured's customer, including insurance services, investment services, real estate services, tax services, trust services and other similar services, under:

   **(1)**  An agreement between any insured and the customer; or

   **(2)** A written contract or agreement between the insured and a third party in which any insured agrees to provide such services for the customer on behalf of the third party;

b.  Planning, managing, administering, advising on or acting in a fiduciary capacity for any deposit account;

c.  Evaluating, analyzing, administering, managing, advising on or servicing, or providing opinions or instructions in connection with, any of the following operations or activities:
   **(1)** Lending, leasing or extension of credit; or
   **(2)** Credit card or debit card;

d.  Checking or reporting of credit;

e.  Maintaining or providing information concerning any financial account, record or balance;

f.  Selling or issuing any travelers check, certified check, bank check, money order, other similar monetary instrument or money transfer; or

g.  Administering or leasing any safe deposit or lock box.

(SUMF ¶38-41)

Curiously, Travelers' memorandum in support of its summary judgment motion failed to address the meaning or significance of the modifier "professional".  Instead, it based its

17

argument on the definition of "credit union financial services" and simply ignored the word "professional" as if it were not even there.  Intentional or not, the modifier "professional" is critical to Travelers' obligations under its policies.

### 2.    *The exclusion is ambiguous.*

If an insurance policy promises something at one point and takes it away at another, there is an ambiguity.  *Hullverson Law Firm, P.C. v. Liberty Ins. Underwriters, Inc.*, 25 F. Supp. 3d 1185, 1194 (E.D. Mo. 2014).  "Such an ambiguity is patent, rather than latent, and may be resolved within the four corners rather than by means of extrinsic aids."  *Burns v. Smith*, 303 S.W.3d 505, 509–513 (Mo. 2010).  An interpretation of an insurance policy which entirely nullifies one provision should not be adopted if the policy is susceptible to an interpretation which gives effect to all its provisions.  *Southeast Bakery Feeds, Inc. v. Ranger Ins. Co.*, 974 S.W.2d 635, 638 (Mo. Ct. App. 1998); *see also Hullverson*, 25 F. Supp. 3d at 1194 ("Missouri law is well-settled that where one provision of a policy appears to grant coverage and another to take it away, an ambiguity exists that will be resolved in favor of coverage.").

In this case, Travelers issued insurance policies to a credit union in three successive years.  Among other things, the policies provided coverage for claims involving allegations of personal injury as that term is defined in the policy.  (SUMF ¶¶ 30-36; Aff. of Robert McKay ¶ 3, Exhibit I; ABECU's Resps. to Travelers' SUMF in Supp. of its Mot. for Summ. J. and Pl.'s Statement of Additional Uncontroverted Material Facts ¶ 44)[4]  Like most credit unions, ABECU provides a variety of financial services to its members, including checking and savings accounts, home mortgages, loans and credit cards.  (Pl.'s Statement of Additional Uncontroverted Material Facts ¶ 44; Aff. of Robert McKay, Exhibit I.)  Included in the loan category are loans for the

---

[4] "We will pay those sums that the insured becomes legally obligated to pay the damages because of "personal and advertising injury" to which this insurance applies."  (Excerpt of Insuring Agreement under Coverage B)

purchase of automobiles in which ABECU takes a security interest in the vehicle.  (Pl.'s Statement of Additional Uncontroverted Material Facts; Aff. of Jerry Steinkuehler, Exhibit J)  It cannot be disputed that Travelers had a detailed understanding of ABECU's business as part of their underwriting process.

As indicated above, Travelers concedes that, absent the exclusion, their policies would afford coverage for the claims in question.  The claims for defamation, slander and libel fall squarely within the definition of "personal injury" found in the policies.

The problem is that the activities described in Travelers' definition of "credit union financial services" are so broad that they literally encompass every facet of ABECU's operations.  (*See* SUMF ¶ 41.)  The very first sentence of the definition states: "any of the services that any insured provides or is required to provide for any insured's customer."  (SUMF ¶ 41.)  That statement alone covers the entire spectrum of ABECU's business.  But there's more. Travelers went on to define "credit union financial services" as "evaluating, analyzing, administering, managing, advising on or servicing, or providing opinions or instructions in connection with… lending, leasing or extension of credit or credit card or debit card", and "checking all reporting of credit".  (SUMF ¶ 42.)  It is hard to envision any activity or function of a credit union that does not fall within the scope of this definition for which, according to Travelers, there would be no coverage.

ABECU obtained and paid for insurance policies that promised coverage for personal and advertising injury—terms which are carefully defined in the policies.  At the same time Travelers advocates for  an undisclosed and overbroad interpretation of an undefined term -*professional*- that would have the effect of nullifying that very coverage.  Travelers is simultaneously granting

coverage for personal and advertising injury claims and then taking it away, *all of it*.  Travelers would be reduced to a mere premium collector, and ABECU would get nothing in return.

If defined as broadly as Travelers advocates, the Professional Credit Union Financial Services Exclusion cannot be reconciled with the purpose of selling Coverage B to ABECU in the first place.  The exclusion is patently in conflict with the remainder of the policy and would have the effect of writing Coverage B out of the policy, a result which is clearly not supported by the Missouri law described herein.  *See Southeast Bakery Feeds*, 974 S.W.2d at 638; *see also Hullverson*, 25 F. Supp. 3d at 1194.  Thus, ABECU requests that the Court make a judicial finding that the "professional credit union financial services" exclusion is patently ambiguous and resolve the coverage dispute in ABECU's favor on that basis alone.

In addition to being patently ambiguous as described above, other ambiguities exist. What did Travelers mean when it inserted the modifier "professional" before the defined term "credit union financial services"?  There is no way to answer the question now and Travelers made no effort to do so in its motion.  Travelers had the opportunity to define this term in the policies and failed to do so.  It now falls on this Court to ascertain the meaning by applying the framework set forth below.

The parties agree that Missouri's rules of contract and insurance policy interpretation govern the outcome of this dispute.  Under Missouri law, because an insurance policy is a contract designated to furnish protection, it will to the extent possible be construed so as to provide coverage and not to defeat it.  *White*, 440 S.W.2d at 511.  "Hence, if the terms are susceptible of two possible interpretations and there is room for construction, provisions limiting, cutting down, or avoiding liability on the coverage made in the policy are construed most

strongly against the insurer." *Farm Bureau Town and Country Ins. Co. of Mo. v. Schmidt,* 751

S.W.2d 375, 376 (Mo. banc 1988).

> An ambiguity exists when there is duplicity, indistinctness, or uncertainty in the meaning of the language in the policy. Language is ambiguous if it is reasonably open to different constructions. Moreover, in construing the terms of an insurance policy, this Court applies the meaning which would be attached by an ordinary person of average understanding if purchasing insurance, and resolves ambiguities in favor of the insured. This rule, often referred to as the doctrine of *contra proferentem,* is applied more rigorously in insurance contracts than in other contracts in Missouri.

*Burns v. Smith*, 303 S.W.3d 505, 509 (Mo. 2010).

"If a provision in an insurance policy is susceptible to two or more meanings, the contract

is ambiguous, and the court must adopt the meaning that is most advantageous to

the insured's position." *Liberty Mut. Ins. Co. v. Havner*, 103 S.W.3d 829, 832 (Mo. App. 2003).

As the drafter, the insurer is in the better position to remove ambiguity from the

contract. *Krombach v. Mayflower Ins. Co., Ltd.,* 827 S.W.2d 208, 211 (Mo. banc 1992).  The

burden rests on the insurer to prove that the loss was within a policy exclusion.  *Christian v.*

*Progressive Cas. Ins., Co.,* 57 S.W.3d 400, 403 (Mo. Ct. App. 2001).

"When there is an ambiguity, insureds are entitled to a resolution of that ambiguity

consistent with their *objective* and *reasonable* expectations as to what coverage would be

provided." *Niswonger v. Farm Bureau Town & Country Ins. Co. of Mo.,* 992 S.W.2d 308, 317

(Mo.App.1999).  It is Missouri's policy not to "use 'technical, philosophical, or scientific

meanings of the terms, nor a restricted meaning acquired in legal usage." *McCormack Baron*

*Mgmt. Servs., Inc. v. Am. Guar. & Liab. Ins. Co.,* 989 S.W.2d 168, 171 (Mo. banc 1999).

The Court should find that the undefined phrase "professional credit union financial

services" is ambiguous as a matter of law and construed against Travelers.  The phrase is

susceptible to more than one meaning, particularly under the standards set forth above.

21

### 3. *The wrongful conduct alleged in the class counterclaim did not involve "professional" activities.*

In the event the Court declines to declare the exclusion unenforceable, it is clear when construed in a light most favorable to ABECU that the modifier *professional* is intended to narrow the scope of the exclusion.  Thus, a claim that otherwise falls within Travelers' definition of "credit union financial services" can only be excluded if the services at issue were *professional,* whatever that means. *See GRE Ins. Grp. v. Metro. Bos. Hous. P'ship, Inc.*, 61 F.3d 79, 84 (1st Cir. 1995) (only inspections that are "professional," as opposed to "nonprofessional," fall within the scope of the exclusion).  The duty falls to this Court to first determine if the phrase "professional credit union financial services" is susceptible to an interpretation which gives effect to all provisions in the policy-keeping in mind the dim view taken by Missouri courts of ambiguous exclusions.  ABECU contends that this language is susceptible to such an interpretation: credit union financial services are covered and *professional* credit union financial services are not.

In performing that analysis, this Court is obligated to objectively look to the ordinary meaning of a term and apply a meaning that the average layperson would reasonably understand. *See Burns*, 303 S.W.3d at 512–13. ABECU believes that the average layperson would interpret the term *professional* to mean something that requires special training, education and/or experience.  Such an interpretation would still give meaning to the exclusion but also preserve the coverage that was granted in the policy.

This Court may elect to consider dictionary definitions of the terms in question.  *Schmitz v. Great Am. Assur. Co.*, 337 S.W.3d 700, 708 (Mo. banc 2011) ("When a policy does not define a particular term, courts use the ordinary meaning of the word as set forth in the dictionary.") The term "professional services" has been defined by Black's Law dictionary as follows:

"Services, which require a formal certification by a professional body, such as legal, medical, accounting, etc. are called professional services."  Black's defines the term "professional" as:

> A person, who is a member of a professional body due to the education qualification and follows the prescribed model and professional code of conduct. A person who has mastered a high level of expertise in a subject, notion on field.

Blacks Law Dictionary-On Line, 2nd Ed.

In addition, the term "professional services" has been defined in Missouri Statutes in the context of professional corporations.  That definition states as follows:

> **"Professional service"** and **"professional services"**:
>
> (a) Any service that lawfully may be rendered only by persons licensed under the provisions of a licensing law of this state and that also may not lawfully be rendered by a corporation organized under the general and business corporation law of Missouri, chapter 351; and
> (b) Practiced by the following professionals, each subparagraph constituting one type:
> a. An accountant;
> b. An architect or engineer;
> c. An attorney at law;
> d. A chiropodist-podiatrist;
> e. A chiropractor;
> f. A dentist;
> g. An optometrist;
> h. A physician, surgeon, doctor of medicine or doctor of osteopathy;
> i. A psychologist;
> j. A veterinarian;
> k. A registered nurse;
> *l.* Any natural person licensed as a real estate salesperson;
> m. A physical therapist;

§356.021, R.S. Mo. (1998).

The above definitions are in keeping with the approach of many courts who have analyzed the use of the term "professional services" when it is undefined in insurance policies. While the Missouri Supreme Court has not yet commented directly on that topic, the Missouri Court of Appeals has.  In *Lincoln County Ambulance Dist. v. Pac. Employers Ins. Co.*, 15

S.W.3d 739 (Mo. App. 1998), the plaintiff ambulance district was insured by an E & O policy issued by the defendant carrier. Lincoln sued the carrier seeking a declaratory judgment that the policy covered Lincoln for alleged violations of the Fair Labor Standards Act.  After the trial court granted summary judgment in favor of Lincoln, the carrier appealed.  The carrier contended, *inter alia,* that the trial court's ruling was erroneous because the policy limited coverage to claims against Lincoln arising out of "any act, error or omission in professional ambulance services rendered."  *Id.* at 742.  The term "professional services" was not defined in the policy.

Lincoln argued that the term "professional services" was ambiguous and the Court of Appeals agreed.  *Id.* at 743.  The court looked for guidance to Webster's Collegiate Dictionary, 930 (10th ed.1995) which defined the term *professional* as "of, relating to, or characteristic of a profession or calling" and "service" as "an act done for the benefit or command of another."  *Id.* at 744.  *Profession* was defined as "a calling requiring specialized knowledge and often long and intensive academic preparation or as a principal calling, vocation or employment."  *Id*.

Since Missouri's highest court has not addressed this specific issue, this Court should predict how Missouri would define the term "professional credit union financial services" as used in the Travelers policies. *See, e.g.*, *Levitt v. Merck & Co., Inc.*, 914 F.3d 1169, 1172 (8th Cir. 2019) (federal court "must attempt to predict what the [state Supreme] court would decide if it were to address the issue based on relevant state precedent, analogous decisions, considered dicta, ... and any other reliable data.").  Clearly, the *Lincoln* case is relevant state precedent and should be considered.

There are also analogous decisions from the federal courts applying Missouri law.  In *American Econ. Ins. Co. v. Jackson, 476 F.3d 620 (8th Cir. 2007)*, the court addressed coverage

questions that arose out of a liability case tried in Missouri.  One of the issues in *American Econ.* was the interpretation of an undefined professional services exclusion in the policy.  The court concluded that whether a particular service is professional in nature requires an analysis of the act or omission itself and not the title or character of the party who performs or fails to perform the act.  "It is recognized that a 'professional act or service' is one arising out of a vocation, calling, occupation or employment involving specialized knowledge, labor or skill, and the labor or skill involved is predominately mental or intellectual rather than physical or manual."  *Id at 625.*

Additionally, in *Jerome Group., Inc. v. Cincinnati Ins. Co.,* 257 F. Supp. 2d 1217 (E.D. Mo. 2003), the plaintiff was a Missouri corporation specializing in graphic communications and printing. One of their customers was a company called Group Health Plan ("GHP"), who retained Jerome to index medical records for storage on computer disk in a retrievable format.  A billing dispute ensued in which GHP claimed that it was overbilled by Jerome in excess of $300,000. Jerome ultimately settled with GHP, after which it filed suit against two insurance carriers from whom it had purchased E & O policies.  The lawsuit sought reimbursement for the settlement amounts Jerome paid to GHP.  Cross-motions for summary judgment were filed.  The district court, applying Missouri law, found in favor of the defendant carriers.

In the course of the opinion, the court analyzed the meaning of the term "professional services" as utilized in the policies, stating:

> Neither the Court nor the parties could find either a Missouri or Eighth Circuit Court of Appeals case defining "professional services." The Court does find, however, the definition of "professional services" quoted in *Medical Records*[5] to be apt.

---

[5] *Medical Records Assocs., Inc. v. American Empire Surplus Lines Ins. Co.,* 142 F.3d 512 (1st Cir.1998).

"The term 'professional' in the context used in the policy provision means something more than mere proficiency in the performance of a task and implies intellectual skill as contrasted with that used in an occupation for production or sale of commodities. A 'professional' act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual.... In determining whether a particular act is of a professional nature or a 'professional service' we must look not to the title or character of the party performing the act, but to the act itself." *Id.* (quoting *Marx v. Hartford Accident & Indem. Co.,* 183 Neb. 12, 157 N.W.2d 870, 872 (1968)).

The "bottom line" was that the "professional services" referred to in the errors and omissions policy "embrace[d] those activities that distinguish a particular occupation from other occupations—as evidenced by the need for specialized learning or training—and from the ordinary activities of life and business." *Id. See also Visiting Nurse Ass'n of Greater Philadelphia v. St. Paul Fire and Marine Ins. Co.,* 65 F.3d 1097, 1101 (3rd Cir.1995) ("A 'professional' act or service is one arising out of a vocation, calling, occupation or employment involving specialized knowledge, labor, or skill." (interim quotations omitted)). *Id.*

*Id.* at 1223-1224.

Many states concur with the above definition of "professional services" and how it is applied.  For example, *see Marx v. Hartford Accident & Indemnity Company*, 157 N.W.2d 870 (Neb. 1968) ("A professional act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual"); *Aerothrust Corp. v. Granada Ins. Co.,* 904 So. 2d 470 (Fla. App. 2005) (professional services exclusion did not apply to the insured's negligent inspection of a hoist because the people who inspected the hoists for the insured were not required to have any specialized training or experience, or even a college or high school diploma.);  *Auto-Owners Ins. Co. v. State Farm Fire & Cas. Co.*, 678 S.E.2d 196 (Ga. App. 2009) (an ordinary task does not become a "professional service," for purposes of a professional services exclusion in a business liability insurance policy, merely

because it is performed by a professional.); *Hartford Cas. Ins. Co. v. New Hope Healthcare, Inc*., 803 F. Supp. 2d 339 (E.D. Pa. 2011) (failure of personal care home to monitor the premises, including patient rooms, during night hours and to be cognizant of the whereabouts of the residents, did not require the use or application of special learning or training); *Jefferson Ins. Co. of New York v. National Union Fire Ins. Co. of Pittsburgh, Pa*., 677 N.E.2d 225 (Mass. App. 1997) (holding that services of medical dispatcher did not constitute "professional services"); *Buckeye Ranch, Inc. v. Northfield Ins. Co*., 839 N.E.2d 94 (Ohio App. 2005) (assignment of rooms at insured's behavior treatment facility where child was sexually assaulted by roommate was administrative decision and not excluded); *Penn Star Ins. Co. v. Real Estate Consulting Specialists, Inc.*, 1 F.Supp.3d 1168 (D. Mont. 2014) (professional services exclusion did not bar coverage for claims against an apartment manager arising from injuries sustained by a resident when she was scalded by hot water as a result of insured's alleged negligent failure to perform routine maintenance duties); *Duke Univ. v. St. Paul Fire & Marine Ins. Co.*, 386 S.E.2d 762, 766 (N.C. App.1990) (the term "professional services" when used in an exclusion "must be interpreted to mean only those services for which professional training is a prerequisite to performance."); *Guar. Nat. Ins. Co. v. N. River Ins. Co.*, 909 F.2d 133, 137 (5th Cir. 1990-applying Texas law) (hospital's failure to maintain window from which the patient fell was not an "exercise of a trained ... judgment in obedience to an established medical policy." To the contrary, the hospital's decision to safeguard Wagner's window through screws in the window sashes rather than through fixed, protective screens was an administrative decision.); *D'Antoni v. Sara Mayo Hosp.*, 144 So. 2d 643, 646–47 (La.  App. 1962) (hospital employee's failure to maintain the side rails on plaintiff's bed did not involve professional judgment. The raising of the side rail was purely a mechanical act which any unskilled person could perform and required no

professional training or knowledge.); the term "professional services" contained in a commercial general liability policy, when not otherwise specifically defined, denotes those services rendered by someone with particularized knowledge or skill in his or her chosen field.); *Boggs v. Camden-Clark Mem'l Hosp. Corp.*, 693 S.E.2d 53, 62 (W. Va. 2010) (to constitute a professional service, the task must arise out of acts particular to the individual's specialized vocation. The task must be necessary for the professional to use his specialized knowledge or training.); *Keepes v. Doctors Convalescent Center, Inc.*, 231 N.E.2d 274 (Ill. App. 1967) (preparing a child for a bath in a children's convalescent center was not a professional service. "While the services in question here may have required some skill on the part of those who rendered the service, it did not require knowledge of the advanced type in a field of learning customarily acquired after a long period of specialized intellectual instruction, *i.e.*, doctors, lawyers, certified public accountants, *etc.*"); *Jefferson Ins. Co. of New York v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* 677 N.E.2d 225, 231 (Mass. App. 1997) (undefined professional services exclusion does not apply to nonspecialized, clerical or administrative activity that require no special learning, intellectual skill or professional judgment. Activities that require only the everyday, practical abilities of the average adult are not official services. "Indeed, to rule otherwise—particularly in the context of a CGL policy generally intended and expected to provide broad liability coverage for tort claims arising out of the insured's entire business and administrative operations would produce an anomalous result.").

The crux of this dispute is whether sending incomplete or inaccurate notices, and the process of sending credit reports to credit reporting agencies, constitute *professional* credit union financial services.   This Court should find that the Missouri Supreme Court would adopt the definitions of *professional* and *professional services* set forth above.  Applying those definitions

to the facts of this case compels a finding that the exclusion does not apply.  As demonstrated by the Affidavit of Jerry Steinkuehler, ABECU's Director of Collections, the completion of notices is an administrative task, and the reporting of credit information to credit bureaus is fully automated based on the information used in part in the notices, the accuracy of which falls to the administrative or clerical staff in ABECU's collections department.  (Plaintiff's Additional Statement of Facts, Exhibit J).

Thus, for ABECU, the sending of notices to defaulted borrowers hardly meets any definition of *professional,* let alone that of an average layman.  The job duties of employees who send such notices require no more than a high school degree.  Likewise, the reporting of delinquent accounts to credit bureaus requires no specialized training or skill that would place that activity in the category of *professional*. Rather, these are standard activities of credit unions that ABECU would reasonably be expect to fall within a CGL policy.

For all the reasons set forth above, this Court can and should declare that the professional credit union financial services exclusion is unenforceable as a matter of law or, in the alternative, that the activities that gave rise to the underlying claims and upon which Travelers bases its exclusion are not *professional* under any commonly understood definition of that term.


WHEREFORE, ABECU prays for an order of this court denying Travelers Motion for Summary Judgment and grant judgment in favor of ABECU on Travelers' claims concerning its duty to defend ABECU under Coverage A of the CGL policies and that the Court grant judgment in its favor on Coverage B by finding as a matter of law that the policies afford indemnity coverage.

29

Respectfully submitted:

MARTIN, PRINGLE, OLIVER,
    WALLACE & BAUER, L.L.P.

By: /s/ David E. Larson
David E. Larson, MO #27146
One Main Plaza
4435 Main Street, Suite 920
Kansas City, MO 64111
(816) 753-6006
(816) 502-7898 fax
delarson@martinpringle.com

MARTIN, PRINGLE, OLIVER,
    WALLACE & BAUER, L.L.P.

/s/ W. Rick Griffin
W. Rick Griffin, KS #21628
*admitted pro hac vice*
100 N. Broadway, Suite 500
Wichita, KS 67202
(316) 265-9311
(316) 265-2955 – fax
wrgriffin@martinpringle.com

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 17th day of June, 2019, the foregoing Anheuser Busch Employees' Credit Union's Suggestions in Opposition to Travelers' Motion for Summary Judgment was filed electronically using the Court's ECF system, which will serve the following counsel of record:

Patrick J. Kenny
Jonathan R. Shulan
7700 Forsyth Blvd., Suite 1800
St. Louis, MO 63105
pkenny@armstrongteasdale.com
jshulan@armstrongteasdale.com
*Attorneys for Defendants*

/s/ David E. Larson
David E. Larson                    #27146