## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

ANHEUSER BUSCH EMPLOYEE )
CREDIT UNION, )
                                              )
         Plaintiff,                           )
                                              )
    vs.                                       )        Case No. 4:18 CV 1208 CDP
                                              )
TRAVELERS PROPERTY )
CASUALTY COMPANY OF )
AMERICA, et al., )
                                              )
         Defendants.                          )

## <u>MEMORANDUM AND ORDER</u>

In this liability insurance coverage dispute, plaintiff Anheuser Busch

Employee Credit Union ("ABECU") seeks to enforce its insurers' alleged coverage

obligations for damages incurred litigating and settling a consumer class action

lawsuit. The defendants, Travelers Property Casualty Company of America and

The Charter Oak Fire Insurance Company (jointly, "Travelers"), now move for

summary judgment, contending the insurance policies issued to ABECU exclude

coverage for the damages alleged in the underlying class action. For the reasons

that follow, I conclude that there was no potential for coverage under the relevant

policies, and that Travelers had no duty to defend ABECU from the underlying

claims or indemnify it against the resulting damages. Travelers is accordingly

entitled to summary judgment on the plaintiff's complaint and on the defendants' counterclaim for declaratory judgment.

## Factual Background[1]

ABECU is a Missouri-chartered credit union which provides a wide range of financial services to its members, including consumer loans for vehicle purchases.[2] On July 29, 2015, ABECU filed a petition in Missouri state court seeking to recover a deficiency judgment against an individual named Daniel Wells following its repossession and sale of Wells' vehicle.[3] On March 14, 2016, Wells filed a counterclaim on behalf of himself, a nationwide class, and a Missouri subclass of similarly-situated borrowers whose vehicles were repossessed and disposed of by ABECU (hereafter, the "counterclaimants").[4]

The counterclaimants "sought relief to redress an unlawful and deceptive pattern of wrongdoing followed by [ABECU] regarding collection . . ., enforcement, repossession, and disposition of collateral."[5] Among other things, the counterclaimants alleged that ABECU failed to issue UCC-compliant notices before accelerating the maturity of the counterclaimants' unpaid balances, before

---

[1] This background is provided only to contextualize the instant dispute; the relevant details of the insurance policies and underlying lawsuit are discussed in the following sections of this Order.
[2] ABECU's Additional Statement of Facts, ECF 44 at ¶ 44.
[3] Travelers' Statement of Material Facts, ECF 38 at ¶ 1.
[4] The allegations as to both classes were based on the same factual and legal theories. Counterclaim, ECF 5-1 at ¶¶ 41-42, 48.
[5] ECF 38 at ¶ 3.

repossessing the counterclaimants' vehicles, before disposing of the repossessed

vehicles, and after the sale of the vehicles.[6]  The counterclaimants further alleged

that ABECU reported false or derogatory credit information related to the

repossessions to local and national credit bureaus.[7]  Broadly speaking, the

counterclaimants alleged that they suffered property damages from the loss of use

of tangible property, as well as personal injury damages in the form of defamation

and harm to credit worthiness.[8]

　　　At all relevant times, ABECU was insured under two policies issued by

Travelers; a Commercial General Liability ("CGL") policy with a $2 million

coverage limit, and follow-form Commercial Excess Liability ("Umbrella") policy

which provided an additional $5 million in coverage.[9]  The policies insured

---

[6] *Id*. at ¶¶ 4-8; ECF 5-1 at ¶¶ 67-87.

[7] *Id*.

[8] *See* ECF 5-1 at ¶ 74, ¶ 88.  The counterclaim included two counts; in Count I, the nationwide class counterclaimants sought damages for:
- a.　　　Loss of use of tangible property and cost of alternative transportation;
- b.　　　Loss resulting from the inability to obtain, or increased costs, of alternative financing;
- c.　　　Harm to credit worthiness, credit standing, credit capacity, character, and general reputation;
- d.　　　Harm caused by defamation, slander and libel;
- e.　　　Harm caused by invasion of privacy; and
- f.　　　Other uncertain and hard-to-quantify actual damages.

In Count II, brought only on behalf of the Missouri subclass, the counterclaimants claimed all of the above damages in addition to:
- g.　　　The surplus after disposition of the collateral that would be equal to the proceeds of disposition less the unaccelerated balance due on the consumer loan contracts and less any wrongfully charged interest; and
- h.　　　All monies paid to [ABECU] by Wells and the Missouri Subclass for the time price differential and delinquency and collection charges on the consumer credit contracts.

[9] ECF 38 at ¶ 13.

ABECU against claims for bodily injury and property damages through coverage labeled "Coverage A," and against claims for personal injury and advertising injury through coverage labeled "Coverage B."[10]

On September 29, 2017, ABECU notified Travelers of the lawsuit and made demand on Travelers to defend against the counterclaim and indemnify ABECU for the resulting damages.[11]  ABECU alleged Travelers was obligated to provide coverage under both Coverage A, for the alleged "property damages" stemming from the counterclaimants' loss of use of their vehicles, and under Coverage B, for the alleged "personal injury" damages stemming from ABECU's issuance of defective notices and false or derogatory credit reporting.[12]  In response, Travelers issued an initial reservation of rights letter agreeing to defend ABECU, but citing exclusions contained in Coverage A and Coverage B, denying their duty to indemnify; Travelers later reversed course and refused to provide any defense.[13]

On July 10, 2018, ABECU received court approval for a settlement with the counterclaimants in an amount which exceeded its professional liability coverage.[14] On May 29, 2018, ABECU again demanded Travelers defend and indemnify it

---

[10] *Id*. at ¶¶ 20-21.
[11] Petition, ECF 5 at ¶ 33-34.
[12] ABECU seeks coverage under Coverage A only as to the damages asserted in subparagraph (a) of the counterclaimants' damage allegations, *see supra* n. 7, and under Coverage B for all remaining damages.
[13] *Id*. at ¶ 35.
[14] *Id.* at ¶ 39.

under the policies, and Travelers again refused.[15]  ABECU thereafter filed the

instant suit against Travelers for breach of contract and vexatious refusal.

Travelers' filed a counterclaim seeking a declaration that they have no duty under

any policy for the claims that are the subject of this lawsuit.

Travelers has moved for summary judgment on both of ABECU's claims.

Because there was no potential for coverage based on the facts alleged in the

counterclaim, I conclude that Travelers had no duty to defend or indemnify

ABECU, and that they are entitled to summary judgment.

## Legal Standards

Missouri substantive law governs this case.  *Hullverson Law Firm, P.C. v.

Liberty Ins. Underwriters, Inc*., 25 F. Supp. 3d 1185, 1190 (E.D. Mo. 2014).  The

interpretation of the meaning of an insurance policy is a question of law.  *Capitol

Indem. Corp. v. 1405 Assocs., Inc*., 340 F.3d 547, 547 (8th Cir. 2003).  "The

general rule in interpreting insurance contracts is to give the language of the policy

its plain meaning."  *Gavan v. Bituminous Cas. Corp.*, 242 S.W.2d 718, 720 (Mo.

banc 2008).  "The burden is on the insured to prove coverage."  *Wolfe Automotive

Group, LLC v. Universal Underwriters Ins. Co.*, 808 F.3d 729 (2015).  Conversely,

the insurer bears the burden of establishing that an exclusion to coverage applies.

*Shelter Mut. Ins. Co. v. Ballew*, 203 S.W.3d 789, 792 (Mo. Ct. App. 2006).

---

[15] *Id*. at ¶ 48.

"An insurer owes two distinct duties to its insured: a duty to indemnify and a duty to defend." *McCormack Baron Mgmt. Servs., Inc. v. Am. Guard. & Liab. Ins. Co.*, 989 S.W.2d 168, 170 (Mo. banc 1999). "An insurer's duty to defend arises only from potential coverage based on facts: 1) alleged in the petition; 2) the insurer knows at the outset of the case; or 3) that are reasonably apparent to the insurer at the outset of the case." *Allen v. Cont'l W. Ins. Co.*, 436 S.W.3d 548, 553 (Mo. banc 2014) (citation omitted). If there is no potential for coverage based on these facts, then the insurer has no duty to defend. *Id*. Where there is no duty to defend, there is no duty to indemnify. *Trainwreck West Inc. v. Burlington Ins. Co.*, 235 S.W.3d 33, 44 (Mo. App. E.D. 2007). Further, "[w]here an insurer [has] no duty to defend or indemnify under the insurance policy, there cannot be a claim for vexatious refusal to defend or indemnify." *Arch Ins. v. Sunset Fin. Servs.*, 475 S.W.3d 730, 735 (Mo. App. W.D. 2015) (citation omitted). As in all cases, summary judgment is only proper where, as here, the moving party establishes that there is no genuine issue as to the material facts and that the movant is entitled to judgment as a matter of law. *Allen*, 436 S.W.3d at 551-552.

## Coverage A – Property Damages

Coverage A provides insurance against claims for "Property Damage," which in relevant part includes damages resulting from the "loss of use of tangible property . . . that is not physically damaged" (hereafter "loss of use" damages).

*See, e.g.* 2016-17 CGL, ECF 38-5 at pg. 215. [16] To trigger coverage under Coverage A, the damage must be caused by an "occurrence," which is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id*. at 166. Relatedly, the policies contain an exclusion barring coverage for "'property damage' expected or intended from the standpoint of the insured" (the "intended injury exclusion"). *Id*. at 154.

Travelers contends that they have no obligation to cover any potential "loss of use" damages under Coverage A because ABECU intentionally repossessed the counterclaimants' vehicles; in other words, Travelers argues the "loss of use" damages were caused by ABECU's deliberate actions, and thus not caused by an accidental "occurrence," notwithstanding any procedural errors in the pre- or post-repossession notice process. Travelers additionally argues the intended injury exclusion bars coverage because ABECU intended to cause the claimed loss of use damages by intentionally carrying out the vehicle repossessions.

In response, ABECU claims that "the act of repossession was not the basis of the counterclaim," instead characterizing the "majority" of the underlying claims as stemming from ABECU's negligence in the pre- and post-sale notice

---

[16] Travelers does not concede that the vehicle repossessions constitute "loss of use" property damages as contemplated by the insuring agreements, and the Missouri Supreme Court has called this assumption into question. *See Allen v. Cont'l W. Ins. Co.*, 436 S.W.3d 548, 555 n. 6 (Mo. banc 2014). Like the *Allen* court, however, I need not address this question here because there is no potential for coverage even assuming the asserted "loss of use" damages constitute "property damage" as defined in the insuring agreements.

drafting process.  Response, ECF 43 at pg. 8-10.  For this reason, ABECU contends the "loss of use" damages are not attributable to the actual vehicle repossessions, but rather are attributable to the counterclaimants' inability to redeem their vehicles post-repossession because of the defective or missing notices.  *Id.* at pg. 9.[17]  ABECU then argues that the issuance of defective notices constitutes an accidental "occurrence," asserting it was unforeseeable that the at-issue notices could have subjected them to statutory liability.

I agree with Travelers that there was no potential for coverage for any claimed "loss of use" damages under Coverage A because the damages are unavoidably attributable to ABECU's deliberate vehicle repossessions, and consequently cannot be attributed to any accidental "occurrence."  The fundamental premise of ABECU's argument—that the asserted "loss of use" damages are conceptually and legally severable from the act of repossession which causes the loss of use—has been addressed and squarely rejected by courts in factually similar wrongful repossession cases involving nearly identical insuring provisions.  *See Landers Auto Group v. Cont'l W. Ins. Co.*, 621 F.3d 810 (8th Cir. 2010); *Allen*, 436 S.W.3d.

---

[17] I note here that this characterization of the underlying counterclaim is somewhat misleading, at least as to the Missouri subclass—the counterclaim specifically alleges that the "loss of use" damages were caused by ABECU's repossessions of the subclasses' vehicles, not merely the inability to redeem the vehicles post-repossession:  "[ABECU] wrongfully repossessed the collateral secured by the consumer credit contracts and caused Wells and the Missouri Subclass the loss of use of tangible property."  Counterclaim, ECF 5-1 at ¶ 80.

In *Landers*, for example, a car dealer wrongfully repossessed a car buyer's vehicle after the buyer's third-party lender erroneously failed to credit payments made on her account. *Landers*, 621 F.3d at 811. In a subsequent coverage dispute, the car dealer argued that the accounting error was an accidental "occurrence," and that the accounting error—as opposed to the vehicle repossession—was the cause of the claimed "loss of use" damages. *Id.* at 815. Interpreting virtually identical Arkansas law, the Eighth Circuit rejected this "square-peg-in-a-round-hole argument" and affirmed summary judgment for the insurer, reasoning that the "loss of use" damages did not arise from the car dealer's accounting errors, but rather from the intentional repossession of the plaintiff's vehicle. *Id.* The Court further held that even if the "loss of use" damages were attributed to the pre-repossession accounting error, coverage was unavailable because the accounting error did not constitute an accidental "occurrence" within the meaning of the policy.[18]

Similarly, in *Allen*, a defendant lending company was sued for "loss of use" damages after wrongfully repossessing the plaintiff's vehicle. *Allen*, 436 S.W.3d at 550. The defendant argued that the damages stemming from the plaintiff's loss of use were caused by an "occurrence" because it had mistakenly determined it had a right to repossess the vehicle. *Id.* at 555. The Missouri Supreme Court

---

[18] "[T]he plain language of the word 'accident' when read in context with the . . . ['occurrence'] definition in the Commercial policy makes it clear the policy refers to physical accidents as opposed to accounting errors." *Id.* at 815.

disagreed, holding that the intentional act of repossession caused the "loss of use" harm and that an "expected or intended injury" exclusion identical to the at-issue exclusion in the CGL consequently barred coverage for the resulting damages: "Even assuming the loss of the [vehicle] itself could amount to 'loss of use' within the meaning of the policy, the exclusion plainly barred coverage because [defendant] intended both the act that caused [plaintiff's] harm and also the harm itself." *Id.* (citing *Landers*, 621 F.3d).

I reach the same commonsense conclusion as the courts in *Landers* and *Allen* in holding that the "loss of use" damages here flowed from the repossessions which literally caused the loss of use. Because repossessing a vehicle is an intentional act, the resulting damages are necessarily considered intentional as well, and cannot be considered the result of an accidental "occurrence." *Id.*; *Landers*, 621 F.3d at 815. This would remain the case here even if the "loss of use" damages were attributed to any pre- or post-repossession administrative errors committed by ABECU because such errors do not constitute accidental "occurrences" within the meaning of the policies.[19] Moreover, the intended injury

---

[19] On this point, I reach the same conclusion as the Eighth Circuit in *Landers* because "occurrence" is defined identically in both insuring agreements, *see Landers*, 621 F.3d at 815, and "accident" is defined essentially identically under Missouri and Arkansas state law. *Compare Columbia Ins. Grp., Inc. v. Cenark Project Mgmt. Servs., Inc.*, 491 S.W.3d 135, 139 (Ark. 2016); *with Columbia Mut. Ins. Co. v. Epstein*, 329 S.W.3d 667, 672 (Mo. App. E.D. 2007). To the extent ABECU relies on *Wolfe Automotive Grp., LLC, v. Universal Underwriters Ins. Co.*, 808 F.3d 729 (8th Cir. 2015) to support the opposite proposition, its reliance is misplaced; the dispositive insuring provision in *Wolfe* covered damages arising from "wrongful

10

exclusion bars Travelers' coverage obligations under Coverage A because ABECU

intended both the act which caused the loss of use and the claimed "loss of use"

damages. For all these reasons, Travelers had no duty to defend or indemnify

ABECU for any damages potentially covered under Coverage A.

## Coverage B – Personal Injury Damages

Coverage B provides that ABECU "will pay those sums that the insured

becomes legally obligated to pay as damages because of 'Personal Injury' or

'Advertising Injury to which this insurance applies.'"[20]  *See* ECF 38-5 at pg. 157.

"Personal injury" is defined:

> (1) False arrest, detention, or imprisonment;
> (2) Malicious prosecution;
> (3) The wrongful eviction from, wrongful entry into, or invasion of the right
> of private occupancy of a room, dwelling or premises that a person
> occupies . . .
> (4) Oral or written publication, including publication by electronic means, of
> material that slanders or libels a person or organization or disparages a
> person's or organization's goods, products or services . . . .
> (5) Oral or written publication, including publication by electronic means, or
> material that:  (a) appropriates a person's name, voice, photograph or
> likeness; or (b) unreasonably places a person in a false light.

*See* ECF 38-5 at pg. 177. The parties generally agree that the asserted damages

stemming from ABECU's allegedly false or derogatory credit reporting would be

---

repossessions" specifically, not "property damages" consisting of the "loss of use of tangible
property." *Wolfe*, 808 F.3d at 730-731.
[20] Only the "personal injury" provision is relevant here, as the class counterclaimants did not
allege ABECU committed any conduct constituting an "advertising injury." ECF 38 at ¶ 12.

covered as "personal injury" damages under the above definition. *See* Travelers' Memorandum in Support, ECF 39 at pg. 11. The parties disagree, however, over the interpretation of a "professional credit union financial services" exclusion added by endorsement to the CGL and Umbrella policies, and the effect of the exclusion on Travelers' coverage obligations.

As relevant to Coverage B, the professional services exclusion provides: "This insurance does not apply to 'personal injury' . . . arising out of providing or failing to provide professional 'credit union financial services' by any insured to others." ECF 38-5 at pg. 193. "Credit union financial services" is defined:

(a) Any of the services that any insured provides or is required to provide for any insured's customer, including insurance services, investment services, real estate services, tax services, trust services and other similar services, under:
  (1) An agreement between any insured and the customer; or
  (2) A written contract or agreement between the insured and a third party in which any insured agrees to provide such services for the customer on behalf of the third party;
(b) Planning, managing, advising on or acting in a fiduciary capacity for any deposit account;
(c) Evaluating, analyzing, administering, managing, advising on or servicing, or providing opinions or instructions in connection with, any of the following operations or activities:
  (1) Lending, leasing, or extension of credit; or
  (2) Credit card or debit card;
(d) Checking or reporting of credit;
(e) Maintaining or providing information concerning any financial account, record or balance. . . .

*Id*. Citing this exclusion, Travelers argues that all otherwise-covered "personal injury" damages alleged in the underlying counterclaim are specifically excluded from coverage by provisions (c)(1), (d), and (e).

ABECU does not dispute that the alleged "personal injury" damages arise out of ABECU's provision or failure to provide "credit union financial services" as defined in the CGL. However, ABECU contends that the scope of the professional services exclusion is so broad that it effectively revokes all coverage that Coverage B purports to provide; for this reason, ABECU asks the Court to declare the entire professional services exclusion patently ambiguous. ABECU additionally argues that the professional services exclusion is ambiguous because the word "professional" is not defined in the insuring agreements. Somewhat incongruously, ABECU argues that the wrongful conduct alleged in the counterclaim did not involve any "professional" services under a judicially-adopted definition of the word, making the exclusion inapplicable to the underlying claims.

By its terms, the professional services exclusion plainly bars Travelers' coverage obligations for all "personal injury" damages alleged in the counterclaim.[21] Moreover, for the following reasons, I conclude that the exclusion

---

[21] The notice-related allegations involve "maintaining or providing information concerning any financial account, record or balance" as defined in subparagraph (e) of the "credit union financial services" definition, and the credit reporting allegations involve the "reporting of credit" and

is unambiguous and, therefore, dispositive as to Travelers' motion for summary judgment.

First, the professional services exclusion is not patently ambiguous for reasons of overbreadth. "It is well-settled that where one section of an insurance policy promises coverage and another takes it away, the contract is ambiguous." *Owners Ins. Co. v. Craig*, 514 S.W.3d 614, 617 (Mo. banc 2017) (citation and quotation omitted). However, "[a]n insured cannot create an ambiguity by reading only a part of the policy and claiming that, read in isolation, that portion of the policy suggests a level of coverage greater than the policy actually provides when read as a whole." *Id.* "[T]he risk insured against is made up of both the general insuring agreement as well as the exclusions and definitions." *Dutton v. Am. Family Mut. Ins. Co.*, 454 S.W.3d 319, 323-24 (Mo. banc 2015). While Missouri law "strictly construes exclusionary clauses against the drafter," *Burns v. Smith*, 303 S.W.3d 505, 510 (Mo. banc 2010), the "mere existence of limitations and exclusions to broad coverage provisions does not, in and of itself, create ambiguity in the contract." *Naeger v. Farmers Ins. Co*., 436 S.W.3d 654, 660 (Mo. Ct. App. 2014); *see also Todd v. Missouri United Sch. Ins. Council,* 223 S.W.3d 156, 162-163 (Mo. banc 2007) ("Definitions, exclusions, conditions and endorsements are

---

"managing . . . [the] lending, leasing or extension of credit" as defined in subparagraphs (d) and (c)(1), respectively.

necessary provisions in insurance policies.  If they are clear and unambiguous within the context of the policy as a whole, they are enforceable.").

The CGL is a standard general liability policy intended to "protect against the unpredictable, potentially unlimited liability that can be caused by accidentally causing injury to other persons or their property."  *Columbia Mut. Ins. Co. v. Schauf*, 967 S.W.2d 74, 77 (Mo. banc 1998) (citation omitted).  Typically, such policies are "not intended to protect business owners against every risk of operating a business."  *Id*.  "In particular, [CGL policies] often exclude from coverage those risks that business management can and should control and manage."  *View Home Owner's Ass'n v. The Burlington Ins. Co*., 552 S.W.3d 726, 730 (Mo. Ct. App. 2018) (citation and internal quotation omitted).  The CGL here is no different—while the professional services exclusion limits Coverage B to exclude coverage for certain controllable business risks, it does not entirely nullify the coverage provided by Coverage B. [22]  Accordingly, because ABECU's exposure to liability for "personal injury" damages is not limited to claims which may stem from its provision of "professional credit union financial services," the

---

[22] For example, the professional services exclusion could not conceivably bar coverage for damages claimed under subparagraphs (1), (2), (3) of the "personal injury" definition, such as a claim by an individual falsely detained by an ABECU branch on suspicion of committing a crime on the premises.  Nor would the professional services exclusion bar coverage for damages under subparagraph (4) resulting from a defamation suit brought by a rival bank for a press release disparaging its integrity, or a claim for damages under subparagraph (5) stemming from an appropriation suit if ABECU improperly used a celebrity's likeness in a publication.

exclusion of those specific damages from coverage does not render the whole professional services exclusion fatally ambiguous.

As to ABECU's second argument, the professional services exclusion is not rendered ambiguous merely because the word "professional" is not defined in the insuring agreements. While an insurance contract may be held ambiguous "when there is duplicity, indistinctness, or uncertainty in the meaning of the language of the policy," *Owners Ins. Co.*, 514 S.W.3d at 617, "[t]he failure of a policy to define a term does not, in and of itself, render it ambiguous." *Trainwreck*, 235 S.W.3d at 40. Instead, when a term is undefined, "the language in a policy is given its ordinary meaning unless another meaning is plainly intended." *Schauf,* 967 S.W.2d at 77. I therefore read "professional" in context with the terms it describes— "credit union financial services"—and afford it its plain, ordinary, and expected meaning: "It is recognized that a 'professional act or service' is one arising out of a vocation, calling, occupation or employment involving specialized knowledge, labor or skill, and the labor or skill involved is predominately mental or intellectual rather than physical or manual." *American Economy Ins. Co. v. Jackson*, 476 F.3d 620, 625 (8th Cir. 2007) (interpreting Missouri law). Because "professional" has a plain and ordinary meaning as applied to insurance contract interpretation under Missouri law, the exclusion is not ambiguous.

In the alternative to its second argument, ABECU suggests that because the word "professional" precedes "credit union financial services" and is not defined in the policies, the services specified in the exclusion must be filtered through the definition of "professional" set forth above in *Jackson*, 476 F.3d at 625. ABECU asserts that allegedly non-professional "administrative support" employees prepared the defective notices by furnishing pre-existing notice templates with loan-specific information, and that its derogatory credit reporting was a largely automated process; for these reasons, ABECU contends that these liability-triggering services were not "professional" in nature, and thus not within the scope of the professional services exclusion. *See* ECF 44 at pg. 28-29. This argument is unpersuasive for several reasons.

First, the policies simply do not reflect that the parties intended the adjective "professional" to have any meaningful bearing on the interpretation and scope of the professional services exclusion. The applicability of the exclusion is plainly stated—Travelers has no obligation to cover ABECU's liability for any damages flowing from the provision of the specific services outlined in the "credit union financial services" definition. The inclusion of the word "professional" does not necessarily imply that the exclusion is inapplicable to the "non-professional" provision of those same specifically-defined services; on the contrary, if the parties intended to impose such a significant limitation on the scope of the exclusion, they

certainly would not have left the operative differentiator—"professional"—undefined. Adopting ABECU's interpretation of the exclusion would belie the plain language of the exclusion and contravene the reasonable expectations of the parties. *See Standard Artificial Limb, Inc. v. Allianz Ins. Co.*, 895 S.W.2d 205, 209 (Mo. Ct. App. 1995) ("In construing an insurance policy, the words must be given their plain meaning, consistent with the reasonable expectations, objectives, and intent of the parties.").

Regardless, even if I liberally construe the policy in ABECU's favor and apply the "professional" filter set forth in *Jackson* to the "credit union financial services" definition, the liability-triggering services at issue here were unquestionably "professional" in nature. The legally deficient content of the notices was the basis of the underlying notice-related claims—not any errors stemming from the manual input of loan-specific information.[23] Ensuring statutory compliance in the creation and issuance of UCC notices requires the "specialized knowledge" and "mental or intellectual" skills of an educated and experienced legal professional, and specifically, a legal professional with technical expertise in the complicated area of UCC secured transactions law. *Jackson*, 476 F.3d at 625.

---

[23] "The principal legal question common to Wells and each class member is whether the presale and post-sale notices sent by [ABECU], or someone at its direction, complied with the UCC." Plaintiff's Additional Material Facts, ECF 44 at ¶ 53; *see also* Aff. of Jerry Steinkuehler, ECF 44-2

The "professional" nature of those services cannot be circumvented by attributing blame to administrative staff who, as ABECU admits, were expressly prohibited from varying from the preexisting notice templates and established repossession protocols.[24] Moreover, the mere fact that clerical employees participated in the notice preparation process is immaterial: "In determining whether a particular act is of a professional nature or a 'professional service' we must look not to the title or character of the party performing the act, but to the act itself." *Jerome Grp., Inc. v. Cincinnati Ins. Co.*, 257 F. Supp. 2d 1217, 1224 (E.D. Mo. 2003) (citation omitted). Similarly, because the derogatory credit reporting claims stemmed from those same errors associated with the vehicle repossessions, the reporting claims are also unavoidably attributable to ABECU's provision of "professional" credit union financial services.[25] Accordingly, to the extent such a conclusion is warranted, I conclude that the liability-triggering services were "professional" in nature and the resulting "personal injury" damages thus excluded from coverage.

In sum, the professional services exclusion excludes Travelers' coverage obligations for all "personal injury" damages flowing from ABECU's provision of

---

[24] "The administrative support staff who prepares and sends these notices exercises no discretion and may not vary from the template requirements or the repossession protocols." ECF 44-2 at ¶ 2.

[25] "In the case of a repossession, the member-specific data that is inputted into the system to prepare the notices referenced in paragraph 2 is the source of some of the information that is contained in the automated upload to the credit bureaus." ECF 44-2 at ¶ 6.

the financial services which prompted the underlying counterclaim, and so there is no possibility of coverage under Coverage B. The exclusion is a standard limitation of liability for ABECU's controllable business risks, and it is not rendered ambiguous merely because the word "professional," which has a plain and ordinary meaning under Missouri law, was left undefined in the policies. To that end, there is no reasonable construction of the exclusion—including the word "professional"—under which the exclusion would not apply to bar Travelers' coverage obligations.

## Conclusion

There was no possibility of coverage for any property damages potentially covered under Coverage A because the claimed "loss of use" damages were not caused by an "occurrence," and because the intended injury exclusion applies to bar Travelers' coverage obligations. Nor was there a possibility of coverage for any "personal injury" damages potentially covered under Coverage B because all such damages stemmed from ABECU's provision of credit union financial services unambiguously excluded from coverage. For these reasons, Travelers had no duty to defend ABECU against the counterclaim nor to indemnify ABECU for the resulting damages, and so it is entitled to summary judgment on ABECU's claims for breach of contract and vexatious refusal. For the same reasons defendants are

entitled to summary judgment on their counterclaim for a declaration that they have no duty to defend or indemnify in connection with those claims.

As there are no remaining issues of material fact and Travelers have shown that they are entitled to judgment as a matter of law,

**IT IS HEREBY ORDERED** that defendants Travelers Property Casualty Company of America and The Charter Oak Fire Insurance Company's motion for summary judgment [37] is **GRANTED**.

An appropriate judgment is entered herewith.


_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 6th day of April, 2020.